The next matter, number 23-1669 and number 23-1812, United States Securities and Exchange Commission versus Henry B. Sargent. At this time, would counsel for the appellant, Sargent, Mr. Ginsburg, please introduce himself on the record to begin. Good morning, Mayor, please, the court. My name is Peter Ginsburg. I'm here with my colleague, Christopher Neff. With the court's approval, I'd like to take eight minutes on our appeal, have Mr. Neff take three minutes, I'm sorry, four minutes to address the SEC's cross-appeal, and then reserve three minutes for rebuttal. Thank you, Your Honor. In order to sustain the Section 5 order by Judge Young, two issues need to be sustained. One is the issue of control and whether Mr. Sargent controlled the one shareholder from whom he purchased shares and sold in the public market. And the second issue is whether that purchase was done with a view towards distribution. If Mr. Sargent didn't control Mr. Persaud, Mr. Persaud is not an issuer. And as a result, if Mr. Persaud is not an issuer, Mr. Sargent is not a statutory underwriter. And with regard to distribution, if Mr. Sargent, or there is evidence to show that Mr. Sargent bought the stock with a view towards investment, then he is not a distributor. And there is no Section 5 violation unless both issues are established adverse to Mr. Sargent with no disputed issues of fact. And the reason, just so I understand, Persaud is the controlling person, the sister is irrelevant, is because all of the shares in play, you're understanding the government to have effectively conceded are shares that went through Persaud? That's correct, Your Honor. In fact, if shares purchased from Ms. Sargent, Carolyn Sargent, provide evidence that Mr. Sargent was not buying with a view towards distribution because he held onto those shares. So that, even of its own, raises an issue of fact regarding distribution. But it was only Mr. Persaud's shares who were sold in the public market. The SEC, interestingly, abandons Judge Young's theory for granting partial summary judgment, this presumption of the middle ground that has no precedent at all other than a 1998 speech that Judge Young gave to a law school class. And it was never adopted by any other judge. What the SEC does in abandoning that theory is it still falls within the same trap as Judge Young. They both ignored material issues of fact. And they both invoked inferences adverse to Mr. Sargent. Judge Young rested his decision effectively on a price disparity between what Mr. Sargent paid Mr. Persaud and what he sold in the public market. The SEC has a sort of two-pronged purported support that Mr. Sargent purchased shares in the private market at a disparity and an indication of control. Well, is there any evidence that Persaud knew that the shares could be sold publicly? Absolutely. I'm glad I was going to get to that, but I'll get to it right now. Appendix A, 5237, the testimony of Mr. Persaud. Did you invest voluntarily? Yes. Did anyone threaten you to buy at any time? No. Did anyone make any promises to you? No. When you chose to sell, did you do so because you were told to, or did you do it voluntarily? I did it voluntarily. Did you know that there was a public market, or going to be a public market, when you sold? Yes. I received the statement. I saw the kicker. I knew that was what Mr. Sargent was doing. And it goes on and on. There's no doubt that that testimony alone raises issue of fact regarding Mr. Persaud knowing there was a market and still making a decision to sell to Mr. Sargent. And I might add, Your Honor, that Mr. Persaud, in some detail, discussed the negotiations he had with Mr. Sargent. Mr. Sargent made an offer to buy the sales privately. Mr. Persaud said no. He negotiated an even better deal with Mr. Sargent. There were multiple factors why a private sale was more appropriate or why Mr. Persaud decided to sell privately. After all, he had first invested because he had faith in Mr. Sargent. He didn't know much about Pixar Bio. At the time they entered into the private sale, there was no public market. Can I just make sure I understand the import of this point? Sure. In Kern, there's a discussion about what constitutes a single transaction and what's the time scope and whether you stop being an affiliate, could you still be part of a single transaction? If I'm following this, am I right to understand you to be saying even if you were to assume an expansive view of a single transaction here in which it began with Sargent while he was still at the company, it still wouldn't suffice to grant summary judgment because the end of that single transaction still resulted in a transaction with Persaud which manifested no control relationship. Is that the idea? That is exactly correct. And it's also important to keep in mind that five weeks before Mr. Sargent. Before you go on to the next point, are you separately making an argument that there is a question at summary judgment as to whether this is a single transaction? No. No. We don't need to address that point in order, I believe, to make it clear that there are disputed issues of that. As I was going to say, five weeks before Mr. Sargent purchased shares for Mr. Persaud, he had severed all of his ties with the company. He had resigned as an officer. He had sold his control box. He no longer was in control at all. And I might point out that the date that the SEC used for that. Doesn't that, to some extent, amount to an argument that this is no longer a single transaction? What it does is show there is. And I understand the point about Persaud on the end of the transaction, but the point you're making there sounds to me like you're necessarily making an argument that it's not a single transaction. If you're saying because Sargent had left, he no longer had a relationship with the company. It doesn't really matter whether it's viewed as a single transaction or not, because what it shows is there are issues regarding control. Of Persaud. Of Persaud, correct. When Judge Young issued his decision. Thank you. Anything further? Just one question. How does the deal between BioPixar and Sargent make any sense, unless BioPixar was relatively assured that they were going to end up with the S1 shares? I mean, they were out $300,000. What were they going to get for $300,000? Well, first of all, it wasn't $300,000. They paid for the control block $108,000. And if your honor looks at the K85055 in the appendix, that gives the accurate numbers. But the fact of the matter is that both Reynolds and Harrod testified that they did not have a commitment from Mr. Sargent. And Mr. Sargent made it clear in his testimony that although he said he would assist in communicating offers to the S1 shareholders, he couldn't make a prediction. That's his testimony. And he couldn't make a commitment that the S1 shareholders would sell. So they paid the $100,000 for the hope that it would work out, perhaps reasonable. That's certainly what the facts suggest, and certainly viable facts suggest that. And remember, when the private sales were made, it was before the press release issued by Pixar Bio, which disclosed this miracle drug. It was before the head of Moderna and the MIT professor announced that he was going to help Pixar Bio. It was, in fact, Pixar Bio was involved in a stock manipulation. But there not only is not a scintilla of evidence that Mr. Sargent knew that, but in fact, when the SEC at trial raised the issue of the Pixar Bio crime, Judge Young specifically instructed the jury that Mr. Sargent, there is no evidence that Mr. Sargent had any knowledge of any stock. On the underwriter claims, you didn't move for summary judgment, though, did you? We did not. But just listening to it, it sounds like you're saying there's no evidence against you. Is that true? I certainly don't think so. But I can understand that there were issues of fact on both sides. And we were going to trial. And so it made, frankly, more litigation sense to elicit before the jury all of the shareholders' testimony. Remember, when you look at Saunders and Carlson and Carroll and Sargent and Purcell, their testimony raises a number of disputed facts. But the SEC only subpoenaed those four shareholders. There were 32 shareholders. And at trial, there was going to be even more robust evidence that there was no control. Thank you, Judge Lynch. Any questions? Just one comment. Judge Kayada asked, why did Pixar put down $100,000 without an assurance that they were going to get the S-1 shares? As I understood your response, it was they thought that this was a wonder drug of some sort. And that news was not yet out on the market. And they had some hopes of getting the S-1 shares and then doing very well by them. You kind of rejected Judge Kayada's theory. But I'm still wondering why the company would be willing to bet $100,000. Your Honor, respectfully, it's not my position to read the minds of Reynolds and Harrod. It is my position that, respectfully, the testimony of Reynolds and Harrod and Sargent was that there was no deal. There was no contingency that Mr. Sargent would make these shares available. And in fact, he made it very clear that that was not a part of the deal, that all he said was he would assist in communicating the offer. You remember, Mr. Sargent was represented by a well-experienced securities attorney who was providing advice and negotiating the deal. There's no testimony whatsoever that there was a contingency that required Mr. Sargent to make available a single share, more or less the entirety of the shares. OK, thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellant, Sergeant Mr. Neff, please introduce himself on the record to begin. You have a four-minute argument. Good morning. May it please the court. Christopher Neff for Mr. Sargent. The commission's cross-appeal rests on two faulty premises. First, the commission insists on appeal that the district court dismiss sui sponte and without explanation the commission's fraud claims. That's not correct. In fact, the commission moved in the trial court, filed a motion to dismiss those claims, and the trial court granted that motion to dismiss. Given that dismissal was sought long after the close of discovery, after a trial and successful appeal, and only weeks before retrial was scheduled to begin, the district court's dismissal with prejudice was a provident exercise of discretion. Second, the commission contends incorrectly that the district court believed it lacked the power to impose a civil penalty even after dismissal of the fraud claims that were set for trial. Now, we concede that the district court's determination that it could not enter a penalty while those claims remained pending was not supported by existing law. However, the record also establishes that the district court correctly understood that it could impose a civil penalty in the absence of those claims after they were dismissed. And we know that because the trial court said so. At the June 15, 2023 conference that led to the issuance of that partial judgment, at that conference, the district court previewed for the parties the terms of the judgment it expected to enter on the Section 5 claim in the absence of a jury trial on the fraud claims. Transcript is in the appendix starting at A5621. Well, isn't the practical issue before us this, that if we were to vacate the judgment against your client and remand for further proceedings based on the argument that there was issues of material fact that precluded summary judgment, should we also vacate the dismissal of the fraud claims? Isn't that the specific issue that's before us? Your Honor, the commission certainly appears to suggest in its reply brief that it had reached some kind of bargain with the trial court whereby it would dismiss those fraud claims only if it was assured of entry of a civil penalty. With respect to my adversary, such a bargain would be completely inappropriate. There's no citation to any authority for such a bargain. And importantly, at that same June 15 conference, I thought the basic idea is they have a ground for overturning the dismissal of the fraud claims. And that's that it was a sua sponte dismissal, because there was no motion to dismiss them. You say there was a motion to dismiss them, they say no. There was a contingent motion to dismiss, and the contingency wasn't satisfied because it was contingent on the civil penalty ruling going their way, which it didn't. So either that construction of the motion to dismiss is wrong or it's right. If it's wrong, then it would seem they've got, we have a question about whether there was a sua sponte dismissal, which would be error. So could you just help us figure out how do we construe that motion to dismiss, and why is it so clear to you that the right way to construe it is that the contingent nature of it that they're contending was what was the evident aim of that motion, is not what the evident aim of that motion is? Why would they have wanted the fraud claims dismissed, regardless of how the civil penalty came out? Certainly. So first, if you look at the motion itself, there's nothing on the face of it. Well, there's that word concurrent, and then there's the three different things concurrently to be done. So the question is, did they mean all of them, some of them, only if? I mean, so is there some practical reason, on your view, why they would have wanted to dismiss the fraud claims, even if they didn't get what they wanted on the civil penalty ruling? Well, Your Honor, the motion does not say we should dismiss only if. I know that. I'm asking, is there some practical reason that it would be fair to impute to the SEC a desire to dismiss the fraud claims, even if they didn't get their way on the civil penalty? Yes, Your Honor. And the reason is, first, that the motion says any penalty the court deems appropriate. Now, they do request a specific penalty, but they also say any penalty the court deems appropriate. And at that June 15 conference, the court addressed how it was going to decide what penalty it would impose in the absence. Last thought. I had thought that the motion to dismiss, when it names three things, the first is the order of relief that had been stayed. The second is the dismissal of the claims. The third is the civil penalty. Yes. I had thought that the order of relief had been stayed expressly, in part, because the fraud claims were pending. That is correct. So I had thought there was a reason for the SEC to dismiss the fraud claims, independent of the ruling on the civil penalty. Because by virtue of the dismissal, it would unstay the order favorable to the SEC. And I had thought that was what, is that a fair construction of what was happening? That is an absolutely fair construction. And further, the motion does lay out the grounds for the relief sought. Specifically, it says, as grounds therefore, grounds for seeking those three things. The commission states that the court's July 12, 2023 order, partial judgment, grants substantially all of the equitable relief sought by the commission. And with the dismissal of the claims, there's no impediment to imposing whatever penalty. Because the district court had said in that order, staying that order, that one of the reasons he was staying it is because the resolution of the fraud claims might affect the scope of the injunctive relief that he was issuing. That is correct. The district court, throughout, took the position that it was not going to enter a partial judgment, because a partial judgment would be appealable when entered. It wanted to proceed to trial or not, and retain the right to modify that partial judgment, depending on what the trial evidence showed. There are no further questions? We would ask that the judgment be vacated. Thank you. Thank you, counsel. At this time, would counsel for the U.S. Securities and Exchange Commission please introduce himself on the record? He has 15 minutes. Good morning, Your Honors. May it please the court, Paul Alvarez for the Securities and Exchange Commission. Your Honors, the summary judgment on the Section 5 claim, and the equitable remedies that the district court ordered as a result of those Section 5 violations should be affirmed. However, the district court committed reversible error in concluding that it had no power to impose a civil penalty. And before I get into the merits, I want to just briefly point out a couple of factual points that I believe need to be clarified here. My friend on the other side has said that there is approximately $100,000 in exchange for the controlling share of the S-1 shares over to Pixar Bio. But I'd like to point the court's attention to A-384, which is the stock purchase agreement. And in that stock purchase agreement, it makes clear that the value paid for the controlling shares was $325,000. Now, the stock purchase agreement does specify that it's $325,000 to be cash and about $200,000 to pay off debt. But how that money is used is less important than the value that was received in exchange for those shares. So the number is $325,000, not $100,000. Just want to make that clear. The other thing about it, let me turn right to the issues here. On summary judgment, my friend has What is not in dispute is that the commission has met its burden of proving a prima facie case that section 5 was violated. So the only issue for this court to decide is whether Mr. Sargent has met his burden of showing that an exemption to the registration requirement has been met. He doesn't have to show that. He just has to show that a jury could find that. There's enough evidence. There is a genuine dispute. That's correct. That's correct, Your Honors. The issue is whether he has shown there's a genuine dispute as to whether an exemption applies. And the undisputed evidence here shows that he hasn't. My friend has made two They say that he testified that he didn't have control over PERSO, and PERSO testified that he didn't have control over PERSO, that PERSO negotiated a higher payment, and that PERSO was aware that the shares could be sold. And so the question to you then is, well, based on all that, could a jury with its broad fact-finding discretion come to a conclusion contrary to the government? To answer your question briefly, the answer is no, a jury could not find. And why is that? Why would that testimony, could they not find that there wasn't control? Here's why. Because control is an objective inquiry. And courts such as the Second Circuit in Kern and the Sixth Circuit in Sierra have decided the issue of control at summary judgment, where the undisputed evidence shows objectively that the defendant was in control of the distribution. And the Second Circuit and the Sixth Circuit in Kern and Sierra have found that, whereas here, a defendant is able to garner overwhelming proportions of the stock at a fraction of the price at which that stock was later sold, that is definitive indicia of control, as the Sixth Circuit found in Sierra, where the defendant possessed and used blank stock powers. And when you say that there's this significant disparity, you're retreating from the district court's focus on the disparity between the price at the time of the initial transaction and what it was ultimately sold for after the fraud. I'm not retreating from that fact, actually. No. I think there are two different price disparities, both of which are significant. The first, which is undisputed, and you don't even need to get to the price at the public market, but as the Sixth Circuit found in Sierra, the disparity between the price at which the shares were reacquired by the control person and then sold to individuals who later sold those shares. And what's that disparity? That disparity is the $325,000 that Mr. Sargent received in exchange for those shares versus $5,800. And that's an outlay of $5,800. He was initially paid $1,600. So we're talking about $325,000 to a net of about $4,000. And that price disparity is even greater than the disparity in Sierra. And the disparity in Sierra was $3,300 that was paid for the shares and later sold for $250,000. But that disparity is not the disparity, just so I follow, that occurs in the transaction with Purcell, or is it? No. No. So, so, so. No, but, but, but it doesn't, I'm sorry, it does include those shares because the $5,800 that Mr. Sargent ultimately laid out for those shares is, includes the $18,000 that he purchased from Purcell at approximately $0.11 per share. The purchase from Purcell, even at $0.11 per share, is at a fraction of the cost at which the shares were later sold to. Right, but if you just look at it from the time Sargent gets them to when he's dealing with Purcell, is there a big disparity there? From when Sargent gets them from Mr. Purcell, is there a disparity? Yeah, where is this big disparity? Well, where's the big disparity? Sargent laid out how much to get the shares? $5,800 to get all of the shares. OK, and then Purcell laid out how much to get? I don't know, he's paid $0.01 a share for $18,000, so. And then Sargent gets them from Purcell? Yes. For how much? $0.11 a share. And then he sells the controlling amount of shares to Pixar Bio. That's where the $350 is? That's where the $325 comes in. And then he later sells the shares that he obtained from Purcell on the public market for even greater amounts. Just so I follow the logic, the idea is when he's dealing with Purcell, they're transacting at a very low price, even though imminently Sargent's going to get a very high price for those same shares when he sells them back to Pixar Bio. That's exactly right. And the Second Circuit in Kern and the Sixth Circuit in Sierra have explained that that price disparity alone is indicative of control. The other indicia of control is the use of blank stock powers, which the Sixth Circuit in Sierra has found. And there are other indicia of control here for the fact that Sargent incorporated BMP, sold the S1 shares to individuals who his lawyer laid out as friendly shareholders that he could easily get the shares back from. He was critically engaged. Yes, sir? There's the sale of the shares to Purcell. Yes. There's then the sale by Purcell back to Sargent. Yes. And that's the second transaction. And the third transaction is Sargent's sale of the shares to BioPixar. So Sargent doesn't sell Mr. Purcell's shares to Pixar Bio. He holds on to those. Because as his lawyer stated in the email at, I believe it's A1339, he needed to hold on to some of those shares because he needed to recoup some of his costs. So what's the third? Why are you talking about the 325 if that was the transaction with BioPixar? Because in viewing control, you have to view control holistically across the distribution. I know my friend wants to talk about Mr. Sargent's shares only as regards to Mr. Purcell. But distributions and control involve the entire process as the Second Circuit said in the error. But what's the evidence of control over Purcell? The evidence of control over Purcell is the fact that he purchased those shares for $0.11 and then later sold them to the public for $0.01. That's the disparity that's generated by the fraud. Certainly, but there's no dispute even there that the prices at which he sold those shares to the public were far greater than the $0.11 per share. But the argument is there's an external event that Well, that's no. If you look at Kern and Sierra, both Kern and Sierra involved pump and dump schemes in which the defendant who was found liable was not necessarily involved. And they were still found liable, even though the price increased afterwards. So it's not. OK, is there some logic to saying that you can deem him to be controlling because he sells at one price and then unknown to him, it's sold to the public at a much higher price because of a fraud he doesn't know about? I'm saying that's one indicia. What's the logic even for that indicia? The logic is, really, the question of control is not sale-specific, OK? It is across the distribution. And you have to look at it holistically, Your Honor. You have to look at, was Mr. Sargent the one controlling this distribution? Was he controlling the shares of stock? And the answer is, undeniably, yes. Yes, Mr. Persaud believed. But based on, you say that we should find that no jury could conclude there was no control because of the differential in two transactions. I'm trying to, and I must not be listening carefully enough, because I'm not exactly sure. You keep hopping between two transactions. I thought you were starting to say the transactions were Persaud in the bio PIXAR. But now you're saying it's the $0.11 he paid to Persaud versus the huge amount that he got when he sold in the public market. So I think I want to take a step back. Is that what you're saying? That's the disparity that we should focus on? I think there are two disparities that are indicative of control. Over Persaud? So there's control over the distribution. That's the issue. Is there control over the distribution? Now, my friend is making this about control over Persaud. And there was control over Persaud. Well, let me see if I can understand it. Were there any shares here sold by Sargent that were not Persaud shares? That is the basis for the Section 5 violation. Well, as the commission argued below. That would seem like a yes, no question. Well, no. The answer is we argued below that Mr. Sargent is not only liable for the shares that he sold, but liable for the shares sold by Mr. Herod and Mr. Giordano. That's why I'm not giving you a yes or no. But in terms of the shares that he actually sold, no, it's Mr. Persaud's shares. But as to that price disparity, there is a disparity. In the summary judgment ruling here, are you saying that even putting aside the Persaud shares, we can find a Section 5 violation? That's correct. That's correct. OK, well, then let's do it in two pieces. Let's start with the theory in which you're just relying on the Persaud shares. OK. Just walk us through, why is there control with respect to the Persaud shares? Because even if Mr. Persaud subjectively believed that he was in control, he ultimately sells the share in a private sale to Mr. Sargent at a price that is far lower than the price at which Mr. Sargent later sold those shares. That's the disparity that he says is a consequence of a fraud he didn't know about. Right, and what I'm saying, the consequence of the fraud is not relevant here. Because as in Kern and Sierra, which also involved pump and dumps at which the defendant was not involved, that price disparity doesn't affect the defendant's liability. That's the logic of that I'm missing out on. Because I can understand that if I buy for $0.01 and I sell for $100, and nothing changed, that suggested at the time I bought for $0.01, I was running the show. Because why else would someone sell to me $0.01 something? I had some huge advantage in that transaction. But if all things weren't the same, some event occurred between the two sales that radically affected the stock, that's luck. It doesn't, it undercuts the basis for inferring that there was some transactional control in the first transaction. Your Honor, I think you have to take a look again at whether the objective facts, not only this price disparity, that's one indicia of control. No, but stay with the price indicia, because you've put primary interest on that. Sure, absolutely. I'm happy to talk about it. And why, if things, I can understand the inference, if all remains constant between sale one and sale two, but if there's a change in the universe that radically affects the price of the shares, why would we infer anything about the transaction? In other words, if we know they were, in fact, worth $0.11 on day one, and they were, in fact, worth $100 on day two, why would we infer any control? All I can say is that the Second Circuit and the Sixth Circuit addressed this question. What did they say? What was their reason? Did they give a reason? I don't recall. Is there a reason? So now, if there isn't, we would just like, does the SEC, policy organization that it is, have some policy that would be furthered by answering Judge Karata's question by saying, even when there is an external event that explains the disparity, we nonetheless should treat it as if it's evidence of control? Yeah, and I think the reason is because you distinguishes between distributions by insiders who have additional information and the average person on the street who's selling a stock, you buying a stock from me on the open market. And the question of control goes to, which type of transaction are we talking about here? And so even if there is some external thing that occurs that makes the price go up, it doesn't change the fact that Mr. Sargent himself was an insider who knew all of these things and who didn't comply with the registry and who was not an average person on the street selling. Did he know the price would go up? Did he know the price would go up? I believe he did, yes. Is there any evidence in the record? But Jury rendered himself to find that he knew the price was going to go up. That's not the question. The question is, was he in control of the distribution and was he in control of the shares? And he ultimately did control them because he purchased them at a price that was lower. It's just comparatively, yes, Mr. Persaud was able to hold out for an extra $0.08, but he still sold for cents on the dollar. Suppose the price had not gone up. Suppose there had been no dumpings. Would Sargent still have control? Yes. Yes. OK, so then the disparity doesn't matter. No, the disparity does matter. Putting the disparity aside, is there anything other than disparity that would compel a jury to find control? Yes, the use of the blank stock powers, the use of Mr. Sargent's, the fact that Mr. Sargent incorporated BMP was involved in the reverse merger at 8-1209 in August 19th email from Mr. Sargent to Frank Reynolds. He says, I'm glad to be a part of the process and happy to make the effort a success for everyone. I'm just waiting for a couple of stragglers, as usual, which shows who is in control of this. It's Mr. Sargent who is running this distribution. So looking at the objective evidence here shows that Mr. Sargent is the one who is making this distribution happen. Can I just ask this one last question? Suppose Persaud said, when he told Persaud I want to sell at this price, Persaud said, no, I want 10x of that. OK. Would that destroy a showing of control? Or is there nothing Persaud could have said that would give a jury a reason to think, well, this seems like an arm's length transaction? I mean, well, I guess you would have to compare what ultimately the price was, if it was 100x or whatever. I think that's a fact-specific determination whether it could be objectively, whether it would objectively undermine the perception. Relative to the spirit, to the ultimate sale price. Because that becomes crucial to your argument. I get it. OK. Yeah. So the other question, I see I'm over my time. You can address the issue about the fraud claims. About the fraud claims, yes. OK. Before you judge Lynch, did you have anything on the summary judgment question? No, you've asked all of my questions.  So my friend, we would ask that the district court reverse, I think, my friend concedes that it was not. Could you just ask me that there was a motion to dismiss? Yes. And as I understand it, one of the things you wanted in that motion was the relief that had been ordered but stayed, correct? Yes, it was stayed pending the resolution of the fraud. Fraud claims. Yes. So absent the dismissal of the fraud claims, you couldn't get that relief, because it would remain stayed, correct? That is correct. So why wasn't the district court correctly interpreting the order as saying they would like to dismiss the fraud claims so they can get the relief, which you got. They'd also like a civil penalty. I'm not giving it. You want us to read it that you get the fraud claims in place and the order would remain in place and be unstayed. And I just don't understand how that's possible. Well, the district court made it clear he was not going to give you that relief until the fraud claims were resolved. So to me, it seems quite natural to read your motion as saying, because what you ordered substantially gives us everything we want, we'll get rid of the fraud claims so we get that relief. We'd also like the civil penalty. We'd like you to do it all together. Not, if you don't give us the civil penalty, we'd like the order keeping the fraud claims. Because there's no way the district court would have given you the order and unstayed it if the fraud claims were still in place. He made that perfectly clear. Well, he also made perfectly clear that he wasn't going to assess civil penalties absent a jury- That's true, but in his order staying the fraud claims, in his order staying the relief on the section 5 claims, he says not just that I'm holding it because of the civil penalty issue. He has a footnote where he says, the resolution of the fraud claims may affect the scope of the injunctive relief, which is another reason for delaying it. Right. So it made all the sense in the world for you to make the calculation, please dismiss the fraud claims because substantially everything we're asking for is in that order. If you'd unstay it, we'd get all that relief. Then the civil penalty is an additional thing you'd want. You didn't get it. But the way you're now constructing it, you get the order unstayed and the fraud claims back in. But there's no way that I can see the district court wanted that to happen. Well, SEC filed a notice of intent with the court. And in that notice, we made clear that we were seeking this for the purpose of getting the courts to remove the legal impediment of the fraud claim so that the court would consider the civil penalties for the Section 5 claim. Yes, but in the motion to dismiss, you also, as they read from, talked about the substantial relief you were going to get from that stayed order. And you wanted that also, which that order, staying it, specifically made the stay contingent on the fraud claims being resolved. I understand what you're saying. I'm saying the intent of the motion was in removing the legal impediment. And we've made multiple statements. Counsel, you framed the motion. Suppose this court views it in just the way that Judge Barrett has articulated. You got what you asked for. And you're now wanting to undo your having asked for that. Is there any policy reason we should relieve you from your request, which was granted, or any case law that you can cite that would lead us to relieve you of what you now think was a bad bargain? Sure, I think what's tricky here is that we haven't admitted error by the judge in concluding that he was powerless to assess civil penalties. And that error really permeated through the other aspects of the case, including how the commission dealt with, how it would move forward both with the fraud claims and requests for injunctive relief. So I think we're in sort of a unique situation here with the judge's error affecting and limiting effectively what the commission could do, and unnecessarily so because of the admitted error. I understand perhaps this court's reluctance to, you know, I understand what this court is saying here. But I think ultimately, you know, if there was a liability finding on section 5 and an opportunity to have the court consider section 5 penalties in the first instance, rather than holding itself that it was powerless to do so. And I just want to briefly state, there is no reasonable reading of the district court's orders that it concluded that civil penalties were inappropriate on the facts and circumstances of this case as the order at A5640. Did the court say that even after the fraud claims were dismissed, it had no power? Yes, Your Honor. At A5640, the court states, it has no power to award a penalty herein where a jury claim has been asserted and not waived. And that was in the September 6, 2023 order. That's at issue here. So in addition to the July 12 order in which it said it was absent a jury verdict, it is beyond the constitutional power of the court to award a penalty and then say it had no power. After the district court did what it did, which you're now saying was a misconstruction of the motion to dismiss, did you apprise the district court of the misunderstanding it had, and therefore ask that it re-institute the fraud claims? No. Why didn't you do that? Because it reads to me like what you thought is, OK, we didn't get the civil penalty, but we got the order. And that's good enough. And who needs the fraud claims? Now, if it turns out you're at risk of losing the order because we're going to overturn summary judgment, not saying we would, it's looking pretty bad. You'd like the fraud claims back. That's just what it wanted to say, what's going on. So I just am a little puzzled why you didn't ask below to say to the district court, oh, that's not what we meant at all. Don't do that. As Your Honor is well aware, and I know Judge Lynch is aware, we've had a history with this case. And it's a very unique case. Fair point. OK, I get it. So. Yeah, thank you. We're well aware. I know you are, Your Honor. Unless the court has any further questions, we would ask that this court affirm the summary judgment and the equitable remedies on the Section 5 claim and reverse the district court's determination that it lacked the power to assess civil penalties and remand for an assessment of those civil penalties. Thanks very much. Thank you. Thank you, counsel. At this time, counsel for the appellant has three minute rebuttal. May it please the court, essentially every purported fact that the government has articulated here is subject to genuine disputes. And I'd like to address some of those. Not the fact that Sargent put together the corporation, did all the work, decided who to offer the shares to, put together then the transaction that would allow this. He was running the show in that perspective. It doesn't seem there is a dispute on that. Respectfully, Your Honor, of the 36 shareholders, 21 of them had nothing to do with Mr. Sargent. They were found by other shareholders. And there is testimony that no one was rewarded for finding other investors. No one was promised anything. So certainly Mr. Sargent ran the company. But any suggestion that he orchestrated a reverse merger, for instance, is flatly disputed. Is there something in the record that explains why he was doing what he was doing? Yes. What is it? In 2009, Mr. Sargent started a yoga school. No, no, no. After he leaves the company, why is he get the Perceaux shares? Well, he got the Perceaux shares himself. What he testified to was he wanted to basically take a flyer on whatever this new company was. I mean, with regard to the distribution issue, Your Honor, we haven't gotten to that, and Judge Young ignored it. Mr. Perceaux's shares were subject to a lockup agreement. Yeah, but he knew the lockup would end at some point. Six months. But he didn't know what was going to happen to the company in six months. It was really a flyer on something that he had been involved with. But the testimony is indisputable that he wasn't involved with Pixar Bio. He wasn't an insider. He wasn't involved in the negotiation. And in fact, I think he talked to Giordano once, Harrod maybe once or twice. Reynolds, I think, three times in total. Non-substantive issues. He wasn't a part of that part of the process. As I ended my last presentation, the question was raised, Your Honor, with regard to why Pixar Bio would have gone along with the deal, even if Mr. Sargent couldn't have provided the other shares. And I omitted stating that, unbeknownst to Mr. Sargent, indisputably, Pixar Bio was planning a nine-to-one stock split after it went public. The stock split gave it more than the shares. In fact, it was fairly insignificant, the percentage of the S1 shares. Thank you. Yeah, go ahead, Judge Reynolds. If I may, so your brother has said it's undisputed that the SEC has made out a prima facie case, irrespective of the district judge's adoption of this presumption. You have the burden. You've argued there are a number of disputed facts as to whether you've met your burden or not. And there are a number of, because of those disputed facts, we cannot say as a matter of law that objectively your client was not entitled to the exemption. So let's assume, hypothetically, that this has to go back for a jury trial or a settlement if there's not a jury trial. Why, given that there was an assumption in dismissing the fraud claims that it was in a certain context, why isn't it fairer in the end to let the SEC pursue the fraud claims if it is going to be remanded? Your Honor, respectfully, the SEC is playing games. On June 15, Judge Young in court said, I'm not going to tell you flat out that I'm not going to impose penalty. But I am not inclined to do that. The SEC knew exactly how Judge Young was leaning. And it decided to proceed as it proceeded, making a motion on this record. Just briefly, I understand I've overstayed my welcome. There's a reason Sierra and Kern have not been followed by any other courts. The facts in Sierra and Kern are different. Is this about the fraud claim question? No, I'm sorry. I think we've got your other points. Yeah, do you have anything else to say on the fraud question point? Respectfully, no, Your Honor. It may be, under those circumstances, it would have been appropriate to have gone back to Judge Young and said, this isn't what we intended. But it is what they intended. And Judge Young made it clear on the record. So it's sort of an unstoppable argument that you're making. The SEC picked its poison and needs to live with it, even if there is a remand. I think, frankly, Your Honor, the SEC didn't want to try the entire case again. It wasn't its poison. It was its way to put an end to it.  I appreciate that, Your Honor. Thank you. Thank you very much. Thank you all. Thank you, counsel. We'll take a break.